AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Colorado

In the Matter of the Search of
Information associated with the e-mail
accounts listed in Attachment A (Subject
Accounts) that are stored at premises owned,
maintained, controlled, or operated by Google
LLC ("GOOGLE"), a company headquartered
at 1600 Amphitheatre Parkway, Mountain
View, CA 94043.

)
)
)
)
)
)

Case No.   21-sw-156-NRN

## APPLICATION FOR A SEARCH WARRANT

I am a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A attached hereto and hereby incorporated by reference.

located in the _____ District of _____ Colorado _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached hereto and hereby incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

18 U.S.C. § 287 (False Claims); 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1031 (Major Fraud Against the United States); 18 U.S.C. § 1040 (Fraud in Connection with Emergency); 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud); 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); 18 U.S.C. § 1957 (Money Laundering Spending Statute)

The application is based on these facts:

See Affidavit attached hereto and hereby incorporated by reference.
- ☑ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/ Jared Erwin*
_____
*Applicant's  signature*

Jared Erwin, Special Agent IRS Criminal Investigation
_____
*Printed name and title*

Sworn to before me and: ☐ signed in my presence.

☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: _____ 02/17/2021 _____

*N. Reid Neureit*
_____
*Judge's signature*

City and state: _____ Denver, Colorado _____

Magistrate Judge N. Reid Neureiter
*Printed name and title*

## <u>ATTACHMENT A</u>

**Property to be Searched**

Information associated with the e-mail account known as **russell.foreman@gmail.com** (hereinafter and in Attachment B "SUBJECT ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by Google LLC (hereinafter and in Attachment B "PROVIDER"), a company headquartered at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

## <u>ATTACHMENT B</u>

### Particular Things to be Seized

### I. Information to be disclosed by Google LLC ("the PROVIDER")

To the extent that the information described in Attachment A is within the possession, custody, or control of Google LLC, regardless of whether such information is located within or outside of the United States, including any emails, messages, records, files, logs, or information that have been deleted but are still available to Google LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on November 3, 2020 and February 1, 2020, Google LLC is required to disclose the following information to the government, in unencrypted form whenever available, for each account or identifier listed in Attachment A:

a. The contents of all emails associated with the account from February 1, 2019 to February 16, 2021, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

b. All records regarding identification of the account, including names, addresses, telephone numbers, alternative e-mail addresses provided during registration, means and source of payment (including any credit card or bank account number), records of session times and durations (including IP addresses, cookies, device information, and other identifiers linked to those sessions), records of account registration (including the IP address, cookies, device information, and other identifiers linked to account registration), length of service and types of services utilized, account status, methods of connecting, and server log files;

c. The types of service utilized;

d. All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e. All telephone numbers ever associated with the account, including phone numbers used for account recovery or two-factor authentication;

f. All payment information (for all services used by the account), including dates and times of payments and means and source of payment (including any credit or bank account number);

g. All device or user identifiers which have ever been linked to the account, including but not limited to all cookies and similar technologies, unique application numbers, hardware models, operating system versions, device serial numbers, Global Unique Identifiers ("GUID"), mobile network information, telephone numbers, Media Access Control ("MAC") addresses, and International Mobile Equipment Identities ("IMEI");

h. Device information, including hardware model, operating system version, unique device identifiers, and mobile network information including phone number for any device ever associated with the account;

i.  Basic subscriber records and login history (including, as described in 18 U.S.C. § 2703(c)(2), names, addresses, records of session times and durations, length of service and types of service utilized, instrument numbers or other subscriber numbers or identities, and payment information) concerning any Google account (including both current and historical accounts) ever linked to the account by a common e-mail address (such as a common recovery e-mail address), or a common telephone number, means of payment (e.g., credit card number), registration or login IP addresses (during one-week period), registration or login cookies (e.g. a "B" cookie) or similar technologies, or any other unique device or user identifier; and

j.  All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

The PROVIDER is hereby ordered to disclose the above information to the government within 14 calendar days of issuance of this warrant.

## II. Information to be seized by the Government

All information described above in Section I that constitute fruits, evidence and/or instrumentalities of violations of 18 United States Code §§ 287, 371, 1031, 1040, 1343, 1349, 1956(h) and 1957 (the "Target Offenses") occurring on or after March 1, 2020, including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a.  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the account about matters relating to the criminal activity under investigation, including records that help reveal their identity or whereabouts;

b.  The identity of the person(s) who created or used the email address, including records that help reveal the whereabouts of such person(s);

c.  Evidence indicating how and when the account was accessed or used, to determine the chronological and geographic context of account access, use and events relating to the Target Offenses and the account subscriber;

d.  Information about the use and transfer of items of monetary value related to the Target Offenses, such as bank accounts, access of those bank accounts through applications and wire or automated clearinghouse (ACH) transfers;

e.  Evidence identifying any co-conspirators or aiders and abettors who communicated with the account about matters relating to the Target Offenses, including records that help reveal their whereabouts;

f.  Information that constitutes evidence indicating the account user's state of mind, e.g., intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

g.  Preparatory steps taken in furtherance of the violations of the Target Offenses;

    h.  Attempts to violate the Target Offenses;

    i.  Other email accounts, remote computing storage locations, physical storage locations, and/or physical computers created, used or maintained by anyone participating in the activity described in the Affidavit; and

    j.  All other information relating to the allegations in the Affidavit, the offenses described in the Affidavit, and any issues relevant to the allegations and offenses described in the Affidavit, including but not limited to proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident with respect to the conduct under investigation; all other information relating to the identification and location of additional evidence relating to any of the foregoing matters described in this attachment; and all other information relating to the use, location, ownership, transfer, and/or disposition of evidence, funds, or other assets.

## III. ORDER OF NON-DISCLOSURE AND TO KEEP ACCOUNT ACTIVE

Pursuant to 18 U.S.C. §§ 2703(b)(1)(A) and 2705(b), the Court orders Google LLC not to disclose the existence of this search warrant to any person for a period of one year, including the subscriber, other than its personnel essential for compliance with the execution of this warrant.

The Court further orders Google LLC to continue to maintain the SUBJECT ACCOUNT in an open and active status so as not to disrupt this ongoing investigation.

## IV. PROVIDER PROCEDURES

Google LLC shall deliver the information set forth above within calendar 14 days of the service of this warrant and Google LLC shall send the information via facsimile or United States mail, and where maintained in electronic form, on CD-ROM or an equivalent electronic medium, to:

    Special Agent Jared Erwin
    IRS Criminal Investigation
    1999 Broadway, 24th Floor
    Denver, CO 80202

Pursuant to 2703(g), the presence of an agent is not required for service or execution of this warrant.

If the government identifies seized communications to/from an attorney, the investigative team will discontinue review until a filter team of one or more government attorneys and other government personnel, as needed, is established. The filter team will have no previous or future involvement in the investigation of this matter. The filter team will identify and segregate communications to/from attorneys, which may or may not be subject to attorney-client privilege. At no time will the filter team advise the investigative team of the substance of any of the communications to/from attorneys. The filter team then will provide all communications that do not involve an attorney to the investigative team, and the investigative team may resume its

review. If the filter team believes that any of the communications to/from attorneys are not actually privileged (e.g., the communication includes a third party), and if the investigation is not covert, the filter team will first seek to obtain agreement from the appropriate defense counsel before providing these attorney communications to the investigative team. If consulting with defense counsel is not possible or does not produce an agreement, the filter team will obtain a court order before providing these attorney communications to the investigative team.

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Jared Erwin, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent (SA) employed by the Internal Revenue Service – Criminal Investigation in Denver, Colorado, and has been so employed for the past 12 years.  During this time, I have been involved with investigations of individuals and businesses involving criminal tax violations of Title 26 of the Internal Revenue Code, and criminal violations of Title 18 U.S.C. §§ 1956 and 1957 (money laundering), as well as, investigations involving other criminal violations under Title 18 of the United States Code.

2.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts ("Subject Accounts") that is stored at premises controlled by Google LLC, which is a provider of wire and electronic communication services headquartered at 1600 Amphitheatre Parkway, Mountain View, CA  94043 ("PROVIDER").  The information to be searched is described in the following paragraphs and as to the Subject Accounts listed on Attachment A.  This  application is made under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.      The facts set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers; my review of documents related to this investigation;

communication with others who have personal knowledge of the events and circumstances described herein; and information gained through my training and experience.  I believe the information that I have set forth herein to be reliable based upon my investigation to date.

4.     Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

5.     Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 287 (False Claims); 18 U.S.C. § 371 (Conspiracy); Title 18 U.S.C. § 1031 (Major Fraud Against the United States); Title 18 U.S.C. § 1040 (Fraud in Connection with Emergency); Title 18 U.S.C. § 1343 (Wire Fraud); Title 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud); Title 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and Title 18 U.S.C. § 1957 (Money Laundering Spending Statute) ("Subject Offenses"),  have been committed by Russell Foreman (Foreman), Melissa Irish (Irish), and Chandler Simbeck (Simbeck).  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband and/or fruits of these crimes as further described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).  As described further below, this search warrant is sought in connection with alleged fraudulent loans obtained from the Small Business Administration ("SBA"), under a program designed to provide economic stimulus in

response to economic fallout that followed the COVID-19 pandemic, namely the COVID-19 Economic Impact Disaster Loan ("EIDL") program.  Loans approved by the SBA under the COVID-19 EIDL program are facilitated by wire transmissions that originate with the SBA Finance Center in Denver, Colorado, with servers located in Denver, Colorado.  After COVID-19 EIDL loans were approved, the SBA in Denver created payment files, which were then transmitted via interstate wire, ultimately resulting in payment of allegedly fraudulently obtained loans into the recipient's designated bank account.  As such, jurisdiction for the alleged wire fraud and conspiracy to commit wire fraud is in Colorado.

### FACTS SUPPORTING PROBABLE CAUSE

#### *Overview of the Economic Injury Disaster Loans & PPP Loans*

7.     On March 27, 2020, President Trump signed into law the Coronavirus Aid, Relief, and Economic Security (CARES) Act, which provided emergency assistance to small business owners, including agricultural businesses, and nonprofit organizations in all the U.S. states, Washington D.C., and territories affected by the Coronavirus (COVID-19) pandemic through the SBA.  The two sources of funding for small businesses were the Paycheck Protection Program (PPP) and the COVID-19 EIDL program.

8.     The provisions of The CARES Act, in conjunction with an officially declared disaster by the United States Government, allowed for the SBA to offer EIDL funding to business owners negatively affected by the COVID-19 pandemic.  Small businesses could receive an advance of funds up to $10,000 and loans of up to $150,000 per entity with a maximum of $2 million including affiliates, with the possible maximum loan amounts changing over time.  Using

the SBA online portal, EIDL applicants input personal and business information with each EIDL application, with minimal to no supporting documentation required.

9.     The application includes a jurat-like paragraph where the applicant affirms that the information submitted is true and correct under the penalty of perjury and applicable criminal statutes.  The application process involves filling out assorted data fields relating to the size of the affected business entity, the ownership of said business, and other information such as the number of employees and gross business revenues realized in the 12 months prior to COVID-19 impact on the national economy.  This information, submitted by the applicant, is then used by SBA systems to calculate the principle amount of money the small business is eligible to receive in the form of an EIDL.  However, in conjunction with the submission of an EIDL application, by simply clicking on and checking a box within the on-line application, an applicant may request and then receive up to $10,000 in an EIDL Cash Advance Grant based on the number of employees claimed.  The EIDL Cash Advance Grant need not be repaid to the SBA if the loan application is ultimately denied by the SBA, or if the applicant declines the EIDL that may be offered by the SBA at a later date.

10.     For most of the applications, the EIDL is based on the Gross Revenues and Cost of Goods Sold for the 12 months prior to January 31, 2020. The basic loan amount calculation is to cover six months of Gross Profit (Gross Revenues minus Cost of Goods Sold).  Example: If Gross Revenues are reported as $100,000 and Cost of Goods Sold as $50,000, the Gross Profit for the year would be $50,000 and half of that would be the loan amount ($100,000 - $50,000 = $50,000 divide by 2 = the loan amount of $25,000).  Currently the maximum loan amount for the EIDL is $150,000 per entity with a maximum $2 million including affiliates.

11.     Pursuant to the provisions governing the EIDL program, loan proceeds must be used by that business on certain permissible expenses.  The EIDL (working capital) loans may be used by the afflicted business, which must have existed in an operational condition on February 1, 2020, to pay fixed debts, payroll, accounts payable, and other bills that could have been paid had the COVID-19 disaster not occurred.

12.     In addition to the EIDL program, The CARES Act authorized up to $349 billion dollars in loans to small businesses for job retention and certain other expenses; known as the Paycheck Protection Program (PPP). Unlike the EIDL program, applicants apply via lending institutions who serve as the underwriters of the PPP.  It is possible that much or all of the amounts borrowed can be forgiven under the program. The covered period of the program was February 15, 2020 thru June 30, 2020.  Eligible borrowers consist of businesses, non-profits, tribal businesses and veterans organizations with not more than 500 employees during the covered period (or if greater, the size standard established by the Administration for the industry). Payroll costs include, salary, wages, vacation, parental, family medical or sick leave, group health insurance, retirement benefits, state and local payroll tax or income of a sole proprietor that is a wage, income or net earnings from self-employment that is not more than $100,000 in one year as prorated for the covered period. The amount of the loan is based on the applicant's representations concerning the amount of salary being paid to employees. Once the loan proceeds are issued, the loan will be fully forgivable if the applicant demonstrates that a specified share of the loan proceeds was spent on the payment of employee salaries.

### *Indicators of Fraud*

13.     On or about August 10, 2020, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), in partnership with the SBA and federal law enforcement,

issued an alert, "Detection and Mitigation of Paycheck Protection Program and Economic Injury Disaster Loan Fraud," to all financial institutions, describing the types of SBA loans (PPP & EIDL), ineligible uses of the loan, fraud indicators, and guidance for returning funds.  The alert included several fraud indicators to assist the financial institutions in identifying fraudulent transactions, including:

- False statements on applications
- Fraudulent supporting documents (e.g., payroll, tax forms)
- Identity theft
- Corporate ID theft (shell corporations)
- Misuse of proceeds
- New Employer Identification Numbers (EIN)
- Shell corporations/dormant EINs
- Recent business incorporations
- Large loan amounts
- Newly created and/or multiple accounts with abnormal transaction activity
- Consumer accounts instead of business accounts
- Quick movement of money in and out of accounts (often within 1-2 days)
- Withdrawals made via cash or apps (e.g., CashApp, Zelle, GreenDot)
- Abnormal transaction activity to payment platforms known for poor anti-money laundering controls
- Transfers to overseas accounts known for poor anti-money laundering controls.

14.    Many of these fraud indicators have been observed within this investigation such as: False statements on applications; Misuse of proceeds; New Employer Identification Numbers; Recent business incorporations; Large loan amounts; Newly created and/or multiple accounts with abnormal transaction activity; Consumer accounts instead of business accounts; Quick movement of money in and out of accounts (often within 1-2 days); and Withdrawals made via cash.

### *Current Investigation*

**Russell Foreman**

15.    Russell Foreman (Foreman) is suspected of fraudulently applying for seven EIDLs and obtained funding of two EIDLs totaling $185,500.  In addition, Foreman applied for two Paycheck Protection Program (PPP) loans under his own name as a self-employed individual and

received one for $20,052.  On six of the seven EIDL applications and on both PPP applications, Foreman listed the e-mail address of russell.foreman@gmail.com.

16.     Foreman has a lengthy criminal history and is currently on parole with the Colorado Department of Corrections.

17.     SBA records show that Foreman applied for seven EIDLs under the following business names: Quantum Boost Technology; Russell Foreman; ECS Consulting LLC; and Grand Luxury Marketing.  Business names were used multiple times on EIDL applications.  As noted above, only two of the seven EIDL applications were funded.

**ECS Consulting LLC**

18.     Colorado Secretary of State records show that ECS Consulting LLC (ECS) was formed on April 21, 2020 by Russell Ray Foreman.  The principal office address of ECS was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 which is a virtual office space providing mail and call forwarding services on a per month rental basis.  The registered agent of ECS is listed as Russell Ray Foreman with an address of 1555 South Havana Street, Unit F #210, Aurora, CO 80012 which is a UPS Store.

19.     SBA records show that an EIDL application in the name of ECS was submitted to SBA on June 18, 2020 listing the owner as Russell Foreman with an e-mail address of russell.foreman@gmail.com.  ECS's address was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 and Foreman's address was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012.  The application stated that ECS was established on February 5, 2019, had annual Gross Revenues of $936,000 and Cost of Goods Sold of $845,000, and had 16 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be $45,500 ($936,000 - $846,000 = $91,000 divided by 2 = $45,500).

20.     On June 23, 2020, based on the applicant information, SBA funded ECS with a $10,000 EIDL Cash Advance Grant.

21.     On June 26, 2020, based on the applicant information, SBA funded ECS with an EIDL of $35,500.

**Grand Luxury Marketing**

22.     Colorado Secretary of State records show that Grand Luxury Marketing (Grand) was formed on June 25, 2020 by Russell Ray Foreman.  The principal office address of Grand was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 which is a virtual office space providing mail and call forwarding services on a per month rental basis.  The registered agent of Grand is listed as Russell Ray Foreman with the same virtual office address.

23.     SBA records indicate that two EIDL applications were submitted for Grand listing the owner as Russell Foreman with an e-mail address of russell.foreman@gmail.com.

24.     On June 26, 2020, SBA records show that an EIDL application in the name of Grand was submitted to SBA listing the owner as Russell Foreman.  Grand's address was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 and Foreman's address was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012.  The application stated that Grand was established on February 22, 2019, had annual Gross Revenues of $596,000 and Cost of Goods Sold of $137,000, and had 13 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be the maximum $150,000 ($596,000 - $137,000 = $459,000 divided by 2 = $229,500).

25.     On August 28, 2020, based on the applicant information, SBA funded Grand with an EIDL of $150,000.

26.     On June 28, 2020, SBA records show that an EIDL application in the name of Grand was submitted to SBA listing the owner as Russell Foreman.  Grand's address was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 and Foreman's address was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012.  The application stated that Grand was established on February 22, 2019, had annual Gross Revenues of $596,000 and Cost of Goods Sold of $137,000, and had 13 employees.  The application was not funded by SBA.

**Quantum Boost Technology**

27.     Colorado Secretary of State records show that Quantum Boost Technology (Quantum) was formed on June 26, 2020 by Russell Ray Foreman.  The principal office address of Quantum was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 which is a virtual office space providing mail and call forwarding services on a per month rental basis.  The registered agent of Quantum is listed as Russell Ray Foreman with an address of 1555 South Havana Street, Unit F #210, Aurora, CO 80012 which is a UPS Store.

28.     SBA records indicate that two EIDL applications were submitted for Quantum listing the owner as Russell Foreman with an e-mail address of russell.foreman@gmail.com; neither EIDL application was funded by SBA.

29.     On June 26, 2020, SBA records show that an EIDL application in the name of Quantum was submitted to SBA listing the owner as Russell Foreman.  Quantum's address was listed as 600 17th Street, Suite 2800 South, Denver, Colorado 80202 and Foreman's address was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012.  The application stated that Quantum was established on March 1, 2019, had annual Gross Revenues of $588,000 and Cost of Goods Sold of $173,000, and had 12 employees.  On August 20, 2020, the EIDL application was declined by SBA.

30.     On June 28, 2020, SBA records show that an EIDL application in the name of Quantum was submitted to SBA listing the owner as Russell Foreman.  The addresses provided for Quantum and Foreman were the same as those listed on the June 26, 2020 application.  The application stated that Quantum was established on March 1, 2019, had annual Gross Revenues of $588,000 and Cost of Goods Sold of $173,000, and had 12 employees.  The application was not funded by SBA.

**Mile High Cleaning Service**

31.     Colorado Secretary of State records show that Mile High Cleaning Service (Mile High) was formed on April 17, 2010 by Russell Foreman and that Mile High has been in Delinquent status with the Colorado Secretary of State since October 1, 2011.  The principal office address of Mile High was listed as 5303 Evans Ave, Denver, Colorado 80222.  The registered agent of Mile High is listed as Russell Foreman with an address of 1450 Elmira Street, Aurora, Colorado 80010.

32.     On August 31, 2020, SBA records show that an EIDL application in the name of Russell Foreman with a business trade name of Mile High was submitted.  Mile High's address was listed as 5303 Evans Ave, Denver, Colorado 80222 and Foreman's address was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012.  The application stated that Mile High was established on April 20, 2010, had annual Gross Revenues of $200,000 and Cost of Goods Sold of $120,000, and had 2 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be $40,000 ($200,000 - $120,000 = $80,000 divided by 2 = $40,000).  The application was not funded by SBA.

**Russell Foreman (business)**

33.     On March 30, 2020, SBA records show that an EIDL application with the business name of Russell Foreman was submitted listing the owner as Russell Foreman with an e-mail address of russell.foreman@gmail.com.  The Russell Foreman business address and Foreman's address were listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012.  The application stated that the Russell Foreman business was established on September 10, 2019, had annual Gross Revenues of $1,500 and Cost of Goods Sold of $0, and had 1 employee.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be $750 ($1,500 - $0 = $1,500 divided by 2 = $750).

34.     On April 15, 2020, based on the applicant information, SBA funded Russell Foreman with a $1,000 EIDL Cash Advance Grant.

35.     On April 17, 2020, the EIDL application was declined by SBA.

**Melissa Irish**

36.     Melissa Irish (Irish) was the recipient of the $80,000 check drawn from the Grand Luxury Marketing LLC bank account on September 1, 2020.  Records show that Irish and Foreman have shared addresses recently, so it is suspected the two either live together or are close acquaintances.

37.     SBA records, described in paragraphs #41 thru 49, show that Irish applied for five EIDLs under the following business names: Mellissa [sic] Irish; and Irish Prosperity LLC.  All applications were submitted from IP Addresses that were confirmed to be subscribed to Russell Foreman.  Business names were used multiple times on EIDL applications.  None of the EIDL applications were funded.

38.     SBA records show that Irish applied for one PPP loan under her own name as a self-employed individual.  The PPP loan was not funded.

**Mellissa Irish (business)**

39.     Colorado Secretary of State records show that a business named Mellissa Irish was formed on June 25, 2020 by Mellissa Mae Irish.  The principal office address of the Mellissa Irish business was listed as 8405 East Hampden Avenue, 24E, Denver, Colorado 80231.  The registered agent of Mellissa Irish is listed as Mellissa Mae Irish with the same address of the business.

40.     SBA records, described in paragraphs #41 thru 46, indicate that four EIDL applications were submitted for the Mellissa Irish business; none were not funded by SBA.

41.     On June 18, 2020, SBA records show that an EIDL application in the business name of Mellissa Irish was submitted.  The Mellissa Irish business address and Irish's address were listed as 7525 East Harvard Avenue, Apt. 201, Denver, Colorado 80231; an apartment address that Foreman used on a FirstBank account in June 2020.  The application stated that Mellissa Irish was established on January 25, 2019, had annual Gross Revenues of $812,000 and Cost of Goods Sold of $726,000, and had 14 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be $43,000 ($812,000 - $726,000 = $86,000 divided by 2 = $43,000).

42.     On June 23, 2020, the EIDL application was declined by SBA.

43.     On June 20, 2020, SBA records show that an EIDL application in the business name of Mellissa Irish was submitted.  The Mellissa Irish business address and Irish's address were listed as 7525 East Harvard Avenue, Apt. 201, Denver, Colorado 80231; an apartment address that Foreman used on a FirstBank account in June 2020.  The application stated that Mellissa Irish was established on January 25, 2019, had annual Gross Revenues of $812,000 and Cost of Goods Sold of $726,000, and had 14 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be $43,000 ($812,000 - $726,000 = $86,000 divided by 2 = $43,000). The application was not funded by SBA.

44.     On June 25, 2020, SBA records show that an EIDL application in the business name of Mellissa Irish was submitted.  The Mellissa Irish business address and Irish's address were listed as 8405 East Hampden Avenue, 24E, Denver, Colorado 80231; the address used on the Colorado Secretary of State filings.  The application stated that Mellissa Irish was established on March 14, 2019, had annual Gross Revenues of $596,000 and Cost of Goods Sold of $112,000, and had 13 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be the maximum $150,000 ($596,000 - $112,000 = $484,000 divided by 2 = $242,000).

45.     On June 27, 2020, the EIDL application was declined by SBA.

46.     On July 2, 2020, SBA records show that an EIDL application in the business name of Mellissa Irish was submitted.  The Mellissa Irish business address and Irish's address were listed as 8405 East Hampden Avenue, 24E, Denver, Colorado 80231; the address used on the Colorado Secretary of State filings.  The application stated that Mellissa Irish was established on March 14, 2019, had annual Gross Revenues of $596,000 and Cost of Goods Sold of $112,000, and had 13 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be the maximum $150,000 ($596,000 - $112,000 = $484,000 divided by 2 = $242,000). The application was not funded by SBA.

**Irish Prosperity LLC**

47.     Colorado Secretary of State records show that Irish Prosperity LLC (Irish Prosperity) was formed on July 1, 2020 by Mellissa Irish.  The principal office address of Irish Prosperity was listed as 8405 East Hampden Avenue, 24E, Denver, Colorado 80231.  The registered agent of Irish Prosperity is listed as Mellissa Irish with the same address of the business.

48.     On July 2, 2020, SBA records show that an EIDL application in the business name of Irish Prosperity was submitted.  The Irish Prosperity business address and Irish's address were

listed as 8405 East Hampden Avenue, 24E, Denver, Colorado 80231.  The application stated that Irish Prosperity was established on March 14, 2019, had annual Gross Revenues of $648,000 and Cost of Goods Sold of $175,000, and had 12 employees.  Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be the maximum $150,000 ($648,000 - $175,000 = $473,000 divided by 2 = $236,500).

49.     On July 2, 2020, the EIDL application was declined by SBA.

**Chandler Simbeck**

50.     Chandler Simbeck (Simbeck) is suspected of fraudulently applying for three EIDLs and obtained funding of one EIDL totaling $150,000.   Simbeck used the e-mail address of chandler.simbeck@gmail.com on all three applications.  In addition, Simbeck applied for three Paycheck Protection Program (PPP) loans but was not approved.

51.     SBA records show that Simbeck applied for three EIDLs under the following business names: Fusion Group and Chandler Simbeck.  Business names were used multiple times on EIDL applications.  As noted above, only one of the EIDL applications were funded.

52.     Based on information obtained from bank records and loan applications, Simbeck resides at 168 Gringo Independence Road, Aliquippa, PA 15001.

**Fusion Group**

53.     Colorado Secretary of State records show that Fusion Group (Fusion) was formed on June 25, 2020 by Chandler Evan Simbeck.  The principal office address of Fusion was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012 which is the same UPS Store address used by Russell Foreman (see paragraphs #18, 19, 24, 26, 27, 29, 32, 33).

54.     On June 26, 2020, SBA records show that an EIDL application in the name of Fusion was submitted to SBA listing the owner as Chandler Simbeck.   The application was

submitted from an IP Address that was confirmed to be subscribed to Etola Leipply at 168 Gringo Independence Road, Aliquippa, PA 15001, the same address as Simbeck (see paragraph #52). Fusion's address was listed as 1555 South Havana Street, Unit F #210, Aurora, CO 80012. The application stated that Fusion was established on February 25, 2019, had annual Gross Revenues of $612,000 and Cost of Goods Sold of $161,000, and had 12 employees. Based on the formula discussed above in paragraph #10, the eligible EIDL amount would be the maximum $150,000 ($612,000 - $161,000 = $451,000 divided by 2 = $225,500).

55.     On August 27, 2020, based on the applicant information, SBA funded Fusion with an EIDL of $150,000.

56.     Between August 31 and September 1, 2020, following the deposit of the funds into the Fusion bank account, Simbeck subsequently withdrew $148,000 from the account via four checks: 1) $8,000 check that was cashed; 2) $30,000 check to Vegviris Consults LLC; 3) $50,000 check to Etola Leipply, the subscriber to the IP Address used to submit the EIDL application and who is believed to be a relative of Simbeck; and 4) $60,000 check to Vegisir Consults LLC.

**Vegisir Consults LLC and Vegvisir Consults LLC**

57.     In addition to Fusion Group, Colorado Secretary of State records show that Simbeck formed two additional entities: 1) Vegisir Consults LLC and 2) Vegvisir Consults LLC on August 28, 2020. Simbeck is listed as the registered agent for both entities with an address of 600 17th Street, Suite 2800 South, Denver, Colorado 80202 which is the same virtual office space address used by Russell Foreman's entities (see paragraphs #18, 19, 22, 24, 27, 29).

**Vegisir Consults LLC transfers money to Foreman**

58.     On October 6, 2020, one of Foreman's personal bank accounts received a $55,000 wire transfer from Vegisir Consults LLC (see paragraph #72). The address listed on the wire

details for Vegisir Consults LLC was 168 Gringo Independence Road, Aliquippa, PA 15001, the same address as Chandler Simbeck and Etola Leipply.

**Other EIDL Applications Related to Foreman**

59.     SBA records indicate that in June 2020, three EIDL applications were submitted for a business named Fontain Robinson; two of the applications were submitted under the Social Security Number of an individual named Fontain Robinson and the other application was submitted under an Employer Identification Number for a business named Fontain Robinson. All three of the applications were submitted from IP Addresses that were confirmed to be subscribed to Russell Foreman.  Two of the applications listed the business e-mail address of russell.foreman@gmail.com.  None of the applications were funded by SBA.

60.     Additionally, SBA records and IP Subscriber information shows that 24 EIDL applications were submitted from an IP Address subscribed to Foreman; 11 of which have not previously been mentioned in this affidavit.

### *Financial Analysis*

61.     Review of Foreman's bank account records from January 1, 2019 thru mid-November 2020 revealed the following regarding the disposition of the EIDL and PPP loan funds obtained by Foreman.

**Grand Luxury Marketing – FirstBank Account**

62.     On June 26, 2020, Foreman opened a checking account at FirstBank in the name of Grand Luxury Marketing.  There was minimal activity within the account until it received a deposit of $149,900 from SBA on August 31, 2020 which represented the EIDL proceeds (less a $100 processing fee) related to the EIDL application in the name of Grand Luxury Marketing detailed in paragraph #24.   Prior to August 31, 2020, there were seven transactions (counting deposits and

withdrawals) totaling $399.05 conducted on the account since its opening and the account balance was $0.05.  The next day, on September 1, 2020, Foreman withdrew $140,000 via two checks: 1) $80,000 payable to Mellissa [sic] Irish, and 2) $60,000 payable to Russell Foreman.  A majority of the remaining funds in the account were spent at online sports betting and gambling websites ($3,500) and a clothing store ($2,999.76).  As of October 26, 2020, the account balance was $685.54 and there had been no transactions conducted since September 8, 2020.

### ECS Consulting LLC – Bank of the West Account

63.     On June 2, 2020, Foreman opened a checking account at Bank of the West in the name of ECS Consulting LLC.  There was no activity within the account until it received a deposit of $10,000 from SBA on June 23, 2020 which represented the EIDL Cash Advance Grant related to the EIDL application in the name of ECS Consulting LLC detailed in paragraph #19.  That same day, on June 23, 2020, two cash withdrawals totaling $7,000 were conducted by Foreman.

64.     On June 26, 2020, the account received a deposit of $35,400 from SBA which represented the EIDL proceeds (less a $100 processing fee) related to the EIDL application in the name of ECS Consulting LLC detailed in paragraph #19.

65.     After this deposit, from June 29, 2020 thru September 4, 2020, Foreman withdrew $34,010 in cash and wired $10,000 to a personal bank account in his name at Navy Federal Credit Union.  There were no other transactions within the account other than a purchase and refund in the same amount with Dell Small Business.  As of October 30, 2020, the account balance was $1,525.

### Russell Foreman – Navy Federal Credit Union Account

66.     On June 10, 2019, Russell Foreman opened a checking and savings account at Navy Federal Credit Union.  From June 2019 thru March 2020, there was minimal activity within the

accounts; the checking account had $2,266.23 in deposits and at times had a negative balance, and the savings account had $10 in deposits.

67.     On April 16, 2020, the checking account received a deposit of $1,000 from SBA which represented the EIDL Cash Advance Grant related to the EIDL application detailed in paragraph #33 in the name of Russell Foreman that was ultimately not funded by SBA.

68.     On May 26, 2020, the checking account received a deposit of $20,052 from Kabbage, a PPP lender.  These funds represented the PPP loan proceeds from one of the two PPP loans that Foreman applied.

69.     On July 20, 2020, the checking account received a $10,000 wire transfer from the ECS Consulting LLC account held by Foreman at Bank of the West (see paragraph #65).

70.     On September 1, 2020, the $60,000 check from the Grand Luxury Marketing FirstBank account (see paragraph #62) was deposited to Foreman's savings account. Subsequently, from September 2 thru November 10, 2020, Foreman transferred $54,945 into his checking account at Navy Federal Credit Union.

71.     From September 15 thru September 24, 2020, the checking account received $71,000 in deposits transferred from a Navy Federal Credit Union account held in the name of Melissa Irish.  The source of the funds from Irish's account was the $80,000 check from the Grand Luxury Marketing FirstBank account (see paragraph #62).

72.     On October 6, 2020, the Foreman's checking account received a $55,000 wire deposit from Vegisir Consults LLC, one of the business entities that Chandler Simbeck transferred a portion of EIDL funds that he received which is detailed in paragraphs #54 thru #57.

73.     From April 1, 2020 thru November 10, 2020, Foreman's checking account received $35,484 in deposits from the Colorado Department of Labor and Employment, that appear related to unemployment insurance.

74.     Debits to Foreman's checking account from April 1, 2020 thru November 10, 2020 consisted of: $41,626 in cash withdrawals; $12,816 in withdrawals at Monarch Casino Blackhawk; $10,295 in withdrawals at Isle Casino Blackhawk; $11,375 in transfers to FanDuel, an online sports betting and gambling website; $4,375 in transfers to BetFairCasino, an online gambling site; $10,000 deposit to TD Ameritrade, an investment company; and $10,000 deposit to TradeStation, an investment company.

75.     As of November 10, 2020, Foreman's checking account balance was $17,477.05 and his savings account balance was $5,053.82.

### *Use of E-Mail Account*

76.     A Court Order ("the Order") pursuant to 18 U.S.C. § 2703(d) was submitted to Google on November 18, 2020.  Pursuant to the Order, Google provided the subscriber information and e-mail header data (i.e. the Date/Time, Sender, To, CC, and BCC) of the e-mails stored in the account of russell.foreman@gmail.com; no e-mail content was provided.  The subscriber information for the account of russell.foreman@gmail.com lists that the account was created on November 21, 2009, and the name on the account is "Russell Foreman" with a telephone number of (720) 205-9934 which records show to be Foreman's cell phone.

77.     Analysis of the e-mail header information from March 1, 2020 through November 17, 2020 showed that the russell.foreman@gmail.com e-mail account communicated with the following e-mail accounts associated to the alleged scheme:

19

78.     8 e-mails were sent from russell.foreman@gmail.com TO individuals at Credibly, a company that partnered with lenders to provide PPP loans;

79.     15 e-mails were sent from russell.foreman@gmail.com TO individuals at YourOfficeDenver.com which is a virtual office space located at 600 17th Street, Suite 2800 South, Denver, Colorado 80202 and is the business address used for many of Foreman's business entities;

80.     2 e-mails were sent from russell.foreman@gmail.com TO chandler.simbeck@gmail.com and 55 e-mails were sent to russell.foreman@gmail.com FROM chandler.simbeck@gmail.com. The e-mail address, chandler.simbeck@gmail.com, is associated to Chandler Simbeck and was used on three EIDL applications, one of which funded for $150,000;

81.     2 e-mails were sent from russell.foreman@gmail.com TO eleipply5@gmail.com and 3 e-mails were sent to russell.foreman@gmail.com FROM eleipply5@gmail.com.  The e-mail address, eleipply5@gmail.com, is associated to Etola Leipply (Leipply) who shares the same address as Chandler Simbeck in Aliquippa, Pennsylvania.  Leipply is believed to be a relative of Simbeck and received a $50,000 check from Simbeck that was funded with EIDL proceeds obtained by a Simbeck entity detailed in paragraph #57;

82.     16 e-mails were sent to russell.foreman@gmail.com FROM chandlerleipply@gmail.com, an e-mail address believed to be associated to Chandler Simbeck since Simbeck's full name is Chandler Evan Leipply Simbeck;

83.     1 e-mail was sent from russell.foreman@gmail.com TO info@grandluxurymarketing.com.  Grand Luxury Marketing is the Foreman business entity that received a $150,000 EIDL detailed in paragraph #24;

84.     4 e-mails were sent from russell.foreman@gmail.com TO Matthew.Norkett@sba.gov and 4 e-mails were sent to russell.foreman@gmail.com FROM Matthew.Norkett@sba.gov.  Matthew Norkett is the SBA employee who approved the $150,000 EIDL to Grand Luxury Marketing;

85.     1 e-mail was sent from russell.foreman@gmail.com TO PPP@kabbage.com. Kabbage is a lender of PPP loans.  Additionally, 16 e-mails were sent to russell.foreman@gmail.com FROM e-mail addresses of Kabbage;

86.     8 e-mails were sent to russell.foreman@gmail.com FROM michaelsrbordeaux@gmail.com, an e-mail associated to Michael Bordeaux who shares the PO Box address with Foreman.  The e-mail address, michaelsrbordeaux@gmail.com, was used on five EIDL applications, none of which funded.   Three of the EIDL applications were submitted from IP Addresses subscribed to Russell Foreman;

87.     1 e-mail was sent to russell.foreman@gmail.com FROM phillisherb@gmail.com, an e-mail address associated to Phillisher Bordeaux, a relative of Michael Bordeaux.  The e-mail address, phillisherb@gmail.com, was used on one EIDL application that did not fund;

88.     1 e-mail was sent to russell.foreman@gmail.com FROM topdawg1436@gmail.com, an e-mail address used by Mellissa [sic] Irish on a debit card account;

89.     59 e-mails were sent to russell.foreman@gmail.com FROM various SBA e-mail addresses such as disastercustomerservice@sba.gov (9); news@updates.sba.gov (42); and region_8@updates.sba.gov (8).

90.     The above usage of Foreman's e-mail account to communicate with others associated to this investigation gives probable cause to believe that Foreman's e-mail account,

described on Attachment A, has been used in the alleged fraud, and that evidence thereof will be found through this warrant.

### ***Information sought is likely to still be present on PROVIDER'S servers***

91.     In general, an e-mail that is sent to a Google subscriber is stored in the subscriber's "mailbox" on Google servers until the subscriber deletes the e-mail.  If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on Google's servers for a certain period of time.

92.     On November 3, 2020, a preservation request was submitted to Google to preserve the contents of the subscriber's "mailbox" for 90 days.  On February 1, 2021, an additional preservation request was submitted to Google to extend the preservation of the subscriber's "mailbox" for an additional 90 days.

### BACKGROUND CONCERNING GOOGLE

93.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("e-mail") access, to the public.  Google allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the e-mail account listed in Attachment A.  Subscribers obtain an account with this PROVIDER by registering with them. During the registration process, the PROVIDER asks subscribers to provide basic personal information.   Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for subscribers) and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail transaction information, and account application information.

94.     In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by the PROVIDER.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

95.     In my training and experience, service providers, like the one discussed in this affidavit, typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (*i.e*., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the PROVIDER's website), devices used to access the account, cookies installed on devices used to access the account, and other log files that reflect usage of the account. In addition, providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

96.     In my training and experience, service providers generally ask their subscribers to provide certain personal identifying information when registering for an account.  Such information can include the subscriber's full name, physical address, telephone numbers and

other identifiers, e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

97.     In my training and experience, in some cases, users will communicate directly with a service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers typically retain records about such communications, including records of contacts between the user and the PROVIDER's support services, as well records of any actions taken by the PROVIDER or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

98.     Therefore, Google's computers are likely to contain stored electronic communications (including retrieved and unretrieved e-mail, voicemail, text messages, and information concerning subscribers and their use of the PROVIDER's services), account access information, e-mail, phone call, and text message transaction information and toll records, account application information, and other relevant information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information may evidence the account user's activities or can be used to identify the account's user or users.

99.     As explained herein, information stored in connection with use of Google's online services may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each

element, or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an e-mail account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, e-mail communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the PROVIDER can show how and when the account was accessed or used.  For example, as described below, e-mail providers typically log the Internet Protocol (IP) addresses from which users access the e-mail account along with the time and date. In some instances, PROVIDER may also track the physical location reported by a device used to access the account. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the e-mail account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via e-mail). Providers may also store information about or from physical devices used to access or associated with the account, which may also help investigations identify the person or persons using the account. Last, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation. For example, information in the e-mail account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

100.    Based on my training and experience, I know that PROVIDER maintains records that can link different accounts to one another, by virtue of common identifiers, such as common e-mail addresses, common telephone numbers, common device identifiers, common computer cookies, and common names or addresses, that can show a single person, or single group of persons, used multiple PROVIDER accounts.  Based on my training and experience, I also know that evidence concerning the identity of such linked accounts can be useful evidence in identifying the person or persons who have used a particular PROVIDER account.

## CONCLUSION

101.    Based on the forgoing, I submit there is probable cause to believe that Russell Foreman, Melissa Irish, and Chandler Simbeck have committed the Subject Offenses, in violation of: Title 18 U.S.C. § 287 (False Claims); 18 U.S.C. § 371 (Conspiracy); Title 18 U.S.C. § 1031 (Major Fraud Against the United States); Title 18 U.S.C. § 1040 (Fraud in Connection with Emergency); Title 18 U.S.C. § 1343 (Wire Fraud); ; Title 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud); Title 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and Title 18 U.S.C. § 1957 (Money Laundering Spending Statute).  Probable cause exists that evidence, fruits, and instrumentalities of the Subject Offenses, as described in Attachment B will be located in the Subject Accounts, identified in Attachment A.  Accordingly, I respectfully request that the Court issue the proposed search warrant.

102.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Google LLC.  Because the warrant will be served on Google LLC,

//

//

who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

*s/ Jared Erwin*
Jared Erwin
Special Agent
IRS Criminal Investigation

Subscribed and sworn to before me on this __16th__ day of February, 2021.

HON. N. REID NEUREITER
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Robert Brown, Assistant United States Attorney.